IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DARRELL WILLIAMS, #179642, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:10-CV-657-WKW |
| | ) | |
| RICHARD ALLEN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This case is pending on an amended complaint filed by Darrell Williams ["Williams"], a former state inmate, in which he challenges the amount withheld by the Alabama Department of Corrections ["ADOC"] from funds he earned while on work-release.[1]  Specifically, Williams complains that the ADOC "illegally with[held] ... earnings in excess of 40% in violation of § 14-8-6 Code of Alabama...."  *Amended Complaint - Doc. No. 7* at 8.[2]  In support of this claim, Williams maintains that in addition to deducting the 40% allowed by state law the ADOC

---

[1]Williams lists several correctional officials as defendants.

[2]Ala. Code § 14-8-6 provides, in pertinent part, as follows:

The employer of an inmate involved in work release shall pay the inmate's wages directly to the Department of Corrections.  The department may adopt regulations concerning the disbursement of any earnings of the inmates involved in work release.  The department is authorized to withhold from an inmate's earnings the cost incident to the inmate's confinement as the department shall deem appropriate and reasonable.  In no event shall the withheld earnings exceed 40 per cent of the earnings of the inmate.  After all expenses have been deducted by the department, the remainder of the inmate's earnings shall be credited to his or her account with the department....

charges fees for (i) transportation provided by correctional personnel to/from an inmate's place of employment, (ii) laundry service for "free-world" work apparel, (iii) independent re-testing of positive urine results showing an inmate's consumption of illegal substances, and (iv) inmate-initiated sick call visits.[3]  Williams argues that because the excess withholdings are not permitted by state law these deductions constitute a "wrongful taking" of his property in violation of the Due Process Clause. *Amended Complaint - Doc. No. 7* at 8. Throughout the complaint, Williams repeatedly makes the conclusory allegation that the ADOC's actions violate his equal protection rights.[4]

On February 6, 2014, the court entered an order "that on or before February 14, 2014 the plaintiff shall show cause why this case should not be dismissed with prejudice as (i) his claims for declaratory/injunctive relief regarding the validity of the defendants' actions under state law in withholding funds [in excess of the 40% authorized by Ala. Code § 14-8-6] have been deemed appropriate by the Alabama Supreme Court in *Thomas v. Merritt, et al.*, __ So.3d __, 2013 WL 6360909 (Dec. 6, 2013);[5] (ii) the decision in *Merritt* likewise forecloses relief on his Fifth

---

[3] Williams also challenges the withholding of a percentage of his income for court-ordered payments. However, it is clear that any payment required by a court order is not a fee imposed by the ADOC and, therefore, provides no basis for relief in this cause of action.

[4] Williams explains the basis for this claim is that all "citizens of Alabama [are entitled] equal protection under the law" in employment activities. *Memorandum in Support of the Complaint - Doc. No. 13* at 14. However, it is clear that Williams, when participating in the work-release program operated by the ADOC, is not similarly situated to free-world citizens who maintain employment. Consequently, any comparison with non-incarcerated individuals fails to implicate the protections of the Equal Protection Clause.

[5] The record establishes that Williams individually filed a state civil action raising a due process claim identical to the one on which he seeks relief from this court, and thereafter served as a class representative in *Merritt* when his state case was consolidated with other similar inmate complaints.

Amendment claim alleging improper taking of property as this right is generally defined by state law, law which was decided adversely to him in *Merritt*; and (iii) his claim for monetary damages [regarding the due process claim is likewise] foreclosed by this court's holding in *DeNorris Williams v. Ala. Dept. of Corrections, et al.*, 2:07-CV-824-WKW-WC (M.D. Ala. 2011)."[6]   *Doc. No. 131* at 1.  Williams filed nothing in response to this order.

## II.  DISCUSSION

### A.  The Due Process Claim

In *Merritt*, the Alabama Supreme Court addressed whether the ADOC could withhold additional gross earnings from work-release inmates beyond the statutory 40% limit assessed for costs incident to confinement.  The Alabama Supreme Court held that the 40% limit set forth in Ala. Code § 14-8-6 applied strictly to costs incident to an inmate's confinement and, therefore, the ADOC may withhold additional earnings from work-release inmates in order to defray costs associated with other expenses, i.e., costs of transporting an inmate to/from his place of employment, costs related to laundering an inmate's free-world work attire, fees accompanying drug tests with positive results and co-pays for inmate-initiated medical visits, as these are not

---

Consequently, it is clear that he is bound by the judgment entered in *Merritt*.  *Taylor v. Sturgell*, 553 U.S. 880, 894, 128 S.Ct. 2161, 2172 (2008).

[6]The prior civil action before this court was filed as a "class action complaint on behalf of all former Alabama prison inmates who participated in a work-release program administered by the ADOC from January 2001 until present, and who worked for private entities and were paid wages.  [The complaint alleged] that Defendants violated the Fifth Amendment to the United States Constitution, first, by deducting any transportation fees from work-release inmates' PMOD accounts, and second, by charging transportation fees in excess of the forty- percent limitation set out in § 14-8-6." *DeNorris Williams v. Ala. Dept. of Corrections, et al.*, 2:07-CV-824-WKW-WC (M.D. Ala. 2011) - *Memorandum Opinion and Order - Doc. No. 58* at 7 (citations to complaint omitted).

costs incident to confinement.  *Merritt*, *supra* at 6-8.  The relevant portion of the state court's

opinion reads as follows:[7]

> "'... The department is authorized to operate a work-release program for inmates. Pursuant to that program, inmates are permitted "to leave the confines [of their places of incarceration] unaccompanied by a custodial agent for a prescribed period of time to work at paid employment." § 14–8–2(a), Ala.Code 1975. Work-release inmates are confined in their respective prisons during the hours they are not at work. § 14–8–2(a). Inmates who are qualified to take part in the program have the option of whether to participate.

> "'Since 1992, § 14–8–6, Ala.Code 1975, has authorized the department to withhold up to 40% of an inmate's work-release earnings for costs "incident to the inmate's confinement." Before 1992, § 14–8–6 provided that the maximum amount of earnings the department was allowed to withhold from an inmate's work-release earnings was 32.5% of those earnings. The record includes a copy of Admin. Reg. No. 410, promulgated by the department, which, in § VII.B., provides that, "[a]s authorized by statute, thirty-two and one-half percent (32 1/2%) of work releasees' gross earnings will be deducted by the Department of Corrections to assist in defraying the cost of his/her incarceration." (Emphasis in original .) Richard Allen, the [then] commissioner of the department, testified by deposition that, after § 14–8–6 was amended to allow the department to withhold up to 40% of an inmate's work-release earnings, the department's policy was to withhold up to 40%, rather than up to 32.5%, of an inmate's work-release earnings even though Admin. Reg. No. 410, § VII.B., had not been formally amended. However, that unwritten policy has been ratified by the commissioner. The copy of Admin. Reg. No. 410 submitted into evidence is dated 1997, and it includes a handwritten notation at § VII.B. stating: "Changed to 40%, see 14–8–6." The balance of a work-release inmate's earnings is deposited into his prison account.

> "'Administrative Regulation No. 410 also authorizes the department to charge inmates participating in the work-release program for the cost of transportation to and from their places of employment. Pursuant to Admin. Reg. No. 410, §VII.B., inmates using transportation provided by the department to and from their work-release jobs may be assessed $2 for a one-way trip and $4 for a round

---

[7] The state court identified the plaintiffs as Jerry Mack Merritt, Thomas Layton, Johnny Walker, Warren R. Robinson and Darrell Williams, the plaintiff in this cause of action.

trip. At the time of trial, however, inmates were being charged transportation costs of $2.50 for a one-way trip and $5 for a round trip.

"'The department also charges work-release inmates a laundry fee for cleaning the "free-world" clothes they wear to their work-release jobs. There is no charge for laundry services for prison-issued clothing....

"'....

"'The department has promulgated a number of other regulations authorizing certain charges at issue in this case. Pursuant to Admin. Reg. No. 601, the department is authorized to charge an inmate a $3 co-pay for "self-initiated" medical visits. If the visit is initiated by medical staff, a physician referral, the warden, or another prison official, the inmate is not charged the co-pay. The regulation also specifies that under no circumstances would an inmate be denied access to health care because of an inability to pay the co-pay. Allen said that the purpose of the co-pay is to discourage malingering among inmates.

"'Pursuant to Admin. Reg. No. 440, § V.F.3., the department is authorized to charge an inmate the cost of a urine drug test performed by an independent laboratory to confirm a positive test for illegal drugs. At the time of trial, that cost was $31.50. If the results of the independent test were negative for illegal substances, the inmate was not charged the fee. Admin. Reg. No. 440, § V.E.5.

* * *

[On appeal], DOC argues that the trial court's final order, to the extent that it incorporated that court's prior holding that the 40% withholding threshold permitted by § 14–8–6, Ala.Code 1975, represents an absolute cap on what the department may withhold, constituted reversible error. More specifically, DOC contends that § 14–8–6 "limits only what the Department may withhold to defray part of the costs of confinement, and does not prohibit additional charges for items that are not incident to confinement," including incidental costs associated with an inmate's participation in the department's optional work-release program. Giving the language of § 14–8–6 its plain and ordinary meaning, we agree.

"In determining the meaning of a statute, this Court looks to the plain meaning of the words as written by the legislature. As we have said:

"""Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous,

> then there is no room for judicial construction and the clearly
> expressed intent of the legislature must be given effect."'

".... It is true that when looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be. Therefore, only if there is no rational way to interpret the words as stated will we look beyond those words to determine legislative intent. To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers. *See Ex parte T.B.*, 698 So.2d 127, 130 (Ala.1997)."

*DeKalb Cnty. LP Gas Co. v. Suburban Gas, Inc.*, 729 So.2d 270, 275–76 (Ala.1998).

Section 14-8-6 provides:

"The employer of an inmate involved in work release shall pay the inmate's wages directly to the Department of Corrections. The department may adopt regulations concerning the disbursement of any earnings of the inmates involved in work release. ***The department is authorized to withhold from an inmate's earnings the cost incident to the inmate's confinement as the department shall deem appropriate and reasonable***. ***In no event shall the withheld earnings exceed 40 percent of the earnings of the inmate***. After all expenses have been deducted by the department, the remainder of the inmate's earnings shall be credited to his or her account with the department. Upon his or her release all moneys being held by the department shall be paid over to the inmate."

(Emphasis added.)

In accordance with the foregoing statute, the department is authorized to withhold from an inmate's earnings reasonable "cost[s] incident to the inmate's confinement." The statute limits the department's withholding powers, however, in that "the withheld earnings," i.e., the costs "incident to the inmate's confinement" that the department deducts, may not exceed 40% of the inmate's earnings.

Section 14–8–6 allows the department to adopt regulations concerning inmate earnings. In accordance, the department adopted such regulations, including amended Admin. Code (Dep't of Corr.) Reg. No. 410, which deducts transportation and laundry costs associated with the inmate's employment after

6

the 40% threshold provided for in § 14–8–6 has been reached, on the ground that the transportation fees are not "costs incident to the inmate's confinement." Similarly, Admin. Code (Dep't of Corr.) Reg. Nos. 440 and 601, as adopted by the department, permit deductions in excess of the 40% threshold for costs associated with drug-testing fees and co-pays for inmate-initiated medical visits, respectively, because those are also not "costs incident" to confinement.

Although, [the parties agree that] ... the phrase "costs incident to confinement" is not defined by § 14–8–6, applying the aforementioned rules of statutory construction, we conclude that the definition supplied by DOC is reasonable. Specifically, DOC defines "the term to mean those costs incurred by the Department in the ordinary course of maintaining physical custody of an inmate in a correctional institution, and not those costs arising from the inmate's voluntary employment, his own wrongdoing, ordinary living expenses, or other obligations of the inmate (such as child support or restitution)."

As DOC notes, [the inmate plaintiffs] offer nothing to show that the definition used by the department deviates from the plain meaning of the Code section. *DeKalb County*, *supra*. The record establishes that the average cost of confinement associated with each inmate is $43 per day. Evidence in the record also suggests that, as a result of the inmates' participation in work release in areas where a public-transportation option is not available, the department incurs significant additional expenses, including, but not limited to, work-related transportation, that it would otherwise not have and that the deductions from the inmates' work-release earnings does not begin to cover those attendant costs.

Commissioner Thomas, during his testimony below, defined "the costs of confinement" as including, at least in part, the following: "Electricity, gas, water, repairs on the buildings, salaries of employees and benefits, food, processing food, transporting food, gas, paper products, health care, mental health care." He further stated that the transportation fees "[are] not related to the confinement itself" but that those fees "relate[ ] directly to [the inmate's] ... employment." He similarly explained that the applicability of the $3 medical co-pay for self-initiated inmate medical visits is determined by medical personnel and is aimed at discouraging "malingering." As to fees associated with the administration of drug tests, the record shows that the inmate is charged for the cost of the confirmation testing only if the inmate tests positive for illegal drug use on an institution-administered drug screen and that result is subsequently confirmed by "a free-world laboratory." The charges challenged by the plaintiffs necessarily resulted not from their confinement but from when, pursuant to their voluntary participation in the work-release program, they opt to and are

7

temporarily permitted to leave that confinement and to work at "free-world" employment.

[The inmate plaintiffs] respond that the use of "incident to" in § 14–8–6 broadens the scope of the threshold to encompass "any costs associated with the inmate's confinement, whether he is, in fact, at that very moment, physically confined." We disagree. Specifically, contrary to [the plaintiffs'] contentions, the necessity of transportation to and from free-world employment is not incident to an inmate's confinement. It is, instead, incident to that inmate's decision to participate in a voluntary program offered by the department. Further, neither costs related to illegal drug use while incarcerated nor costs related to purportedly unnecessary medical care arise from an inmate's confinement within the department. Instead, each of the challenged deductions results from a voluntary and unnecessary undertaking by the inmate. Thus, we hold that the plain language of the statute does not prohibit the department from collecting, over and above the 40% threshold established by § 14–8–6, costs that are not incident to the inmate's confinement, including transportation costs and other fees stemming from the inmate's participation in the department's optional work-release program.

In consideration of the foregoing, we find that the department's interpretation of § 14–8–6 as permitting its collection of charges, which are not incident to the inmate's confinement, in excess of the 40% withholding cap established by that statute is both reasonable and consistent with the statutory language....

*Thomas v. Merritt, et al.*, 2013 WL 6360909 at 1-8 (Ala. December 6, 2013) (citations to briefs omitted) (footnotes omitted).

In *DeNorris Williams v. Ala. Dept. of Corrections, et al.*, 2:07-CV-824-WKW-WC (M.D. Ala. 2011), this court addressed an inmate's challenge to the deduction of fees in excess of the forty percent limitation set forth Ala. Code §14-8-6 and determined that the Richard Allen, as a state official, was "immune from suit as to the § 1983 claim[s] brought against him in his official capacity for monetary damages." *Williams*, *supra*. - *Doc. No. 58* at 11. This court further held that Commissioner Allen was "entitled to qualified immunity from [the plaintiff's] § 1983 Fifth Amendment Takings claim seeking monetary damages from him in his individual

capacity" because the plaintiff had failed to show that the asserted property right was clearly established at the time the challenged fees were deducted from his work-release earnings. *Id*. at 22. Finally, the court determined that the request for prospective injunctive relief was likewise due to be denied as the plaintiff was no longer a participant in the work-release program. *Id*. 22-23. All of these findings remain relevant to the claims currently before this court seeking monetary and injunctive relief from various state correctional officials.

The due process claim is precluded by *res judicata* arising from the determination of the Alabama Supreme Court in *Merritt*.[8]

> The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as "res judicata." Under the doctrine of claim preclusion, a final judgment forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *New Hampshire v. Maine*, 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Issue preclusion, in contrast, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment," even if the issue recurs in the context of a different claim. *Id*., at 748-749, 121 S.Ct. 1808. By "preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate," these two doctrines protect against "the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153-154, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

*Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S.Ct. 2161, 2171 (2008).

---

[8] In the *DeNorris Williams* opinion, this court repeatedly stated that the decision of the Alabama Supreme Court in *Merritt*, when entered, would ultimately be dispositive of the issue regarding any property interest afforded work-release inmates in fees assessed and withheld in excess of the 40% permitted by Ala. Code § 14-8-6.

"Our res judicata analysis has always required a consideration of the facts and legal theories of two causes of action as well as the rights and duties involved in each case." *Draper v. Atlanta Indep. Sch. Sys.,* 377 Fed. Appx. 937, 940 (11th Cir. 2010) *certiorari denied*, 131 S.Ct. 342, 178 L.Ed. 2d 223, 79 USLW 3205 (Oct. 4, 2010) (citing *Manning v. City of Auburn*, 953 F.2d 1355, 1359 (11th Cir. 1992)). "We have consistently concluded that when the substance and facts of each action are the same, res judicata bars the second suit." *Id.* In *I.A. Durbin, Inc. v. Jefferson National Bank*, 793 F.2d 1541 (11th Cir. 1986), the Court summarized the doctrine of res judicata as follows:

> Res judicata or claim preclusion refers to the preclusive effect of a judgment in foreclosing relitigation of matters that were litigated or could have been litigated in an earlier suit.... In order for the doctrine of res judicata to bar a subsequent suit, four elements must be present: (1) there must be a final judgment on the merits; (2) the decision must be rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, must be identical in both suits; and (4) the same cause of action must be involved in both cases.

*I.A. Durbin*, 793 F.2d at 1549 (citations omitted). With respect to Williams' claim challenging the withholding of earnings above the limit set forth in Ala. Code § 14-8-6 as violative of his right to due process and after review of the *Merritt* decision, it is clear that each of the four requisite elements for application of the bar of res judicata is present. In addition, the previous opinion of this court establishes that Williams is due neither monetary damages nor injunctive relief on his improper taking of property claim. The court provided Williams the opportunity to dispute the preclusive effect of the aforementioned decisions and

10

show cause why this due process claim should not be dismissed.  *Order of February 6, 2014 - Doc. No. 131.*  Williams, however, filed no response to this order.  Accordingly, the court concludes that Williams is entitled to no relief on his due process claim and this claim is subject to dismissal.

### B.  The Equal Protection Claim

Williams alleges that the actions about which he complains deprived him of Equal Protection.  This claim, however, is subject to summary dismissal because merely labeling actions of the defendants as "discriminatory" fails to state a claim on which relief may be granted.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Despite the tendency of all rights 'to declare themselves absolute to their logical extreme,' there are obviously limits beyond which the equal protection analysis may not be pressed....  The Fourteenth Amendment 'does not require absolute equality or precisely equal advantages,'... nor does it require the State to 'equalize [prison] conditions.'"  *Ross v. Moffitt*, 417 U.S. 600, 611-612 (1974); *Hammond v. Auburn University*, 669 F.Supp. 1555, 1563 (M.D. Ala. 1987) ("The Equal Protection Clause of the Fourteenth Amendment does not require all persons to be treated either identically or equally.").  In order to present a claim of discrimination cognizable under the Equal Protection Clause, "a prisoner must [at a minimum] demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis.  *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001);

*Damiano v. Florida Parole and Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986)." *Sweet v. Secretary, Department of Corrections*, 467 F.3d 1311, 1318-1319 (11th Cir. 2006). "[O]fficial action will not be held unconstitutional solely because it results in a ... disproportionate impact.... Proof of ... discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-265 (1977). "'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker ... selected ... a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991).  Evidence which merely indicates disparity of treatment or even arbitrary administration of state powers, rather than instances of purposeful or invidious discrimination, is insufficient to show discriminatory intent.  *McKleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

As previously noted, Williams is not similarly situated with free-world citizens who are members of the work force.  *Supra* at 2 n.4.  In addition, Williams fails to identify any similarly situated inmate who received differential favorable treatment from the defendants.  Thus, Williams' "equal protection claim necessarily fails ... because he has not [asserted] that he was treated differently from other, similarly situated prisoners [or individuals]." *Sweet*, 467 F.3d at 1319.  Consequently, this claim is due to be summarily dismissed pursuant to the provisions of 28 U.S.C. § 1915(e)(2)(B)(ii).

### III.  CONCLUSION

For the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that this case be DISMISSED with prejudice.

It is further

ORDERED that on or before March 6, 2014, the parties may file objections to this Recommendation.  Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 20th day of March, 2014.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE